## SAXE v. PENOKEE LUMBER CO.

(Supreme Court, Appellate Division, Third Department. December 2, 1896.)

SALES—REMEDIES OF BUYER—MEASURE OF DAMAGES.

The rule that the measure of damages for breach of contract of sale is the difference between the contract price and the market price at the time and place of delivery does not apply in case of a breach of contract by defendant to sell to plaintiffs lumber of a specified quality manufactured by defendant at its mill, from timber cut in a designated region, and guarantied to average as good a quality as lumber bought the year before by plaintiffs from a person named, where plaintiffs were not purchasing the lumber for any special purpose, but for general sale in the market, and they could have obtained other lumber of the same dimensions, and of equally good quality, at the same price, but neglected so to do. Parker, P. J., dissenting.

Appeal from judgment on report of referee.

Action by Frank J. Saxe, surviving partner of the firm of Saxe Bros., against the Penokee Lumber Company, to recover damages for breach of a contract for the sale and delivery by defendant to such firm of a certain quantity of lumber. From a judgment entered on the report of a referee in favor of plaintiff for $8,042.48 and costs, defendant appeals. Reversed.

The plaintiff is the surviving member of the co-partnership of Saxe Bros., a co-partnership engaged in the business of buying and selling lumber. The defendant is a corporation engaged in the business of manufacturing lumber, having mills in Wisconsin, and its principal office at Tonawanda, N. Y. On the 31st day of January, 1890, defendant sent to Saxe Bros. a letter, which in part reads as follows: "We hereby offer you, for prompt acceptance, lumber, on the following prices, terms, and conditions: Quantity of lumber to be six million feet, quality No. 2 cutting up and better, the whole guarantied to average as good a quality as our 5—4 and 6—4 sold to you by A. M. Dodge & Co., of this place, last autumn. The above six million feet of lumber is to be sawn from logs we are now getting out in Ashland Co., Wis., to be sawn at our mills at Horse Station, Ashland Co., Wis." Then follows a statement of the dimensions of the lumber to be furnished. Then the following: "Delivery of above lumber to be f. o. b. canal boats at this place, we undertaking to deliver about 2 million feet on or before about July 1, '90, about 1½ million feet during the month of July, about 1½ million feet during the month of August, and the balance during the month of September next; and in the event of all not being delivered before Oct. 1, '90, we are to pay such canal freight on any balance which we deliver after that date as may be in excess of the average rate of canal freights on such of this lumber as we deliver during the month of September next." This lumber was to be furnished at the price of $29.50 per 1,000, but, by a subsequent letter, the first one was modified so that the amount of lumber to be furnished was 4,000,000

feet, and the price $28.50 per 1,000, which Saxe Bros.' firm agreed to pay, and to advance upon the purchase price the sum of $40,000, and further agreed that, as the shipments of this lumber should be from time to time received by them, they could apply one-half of the amount thereof upon such advancement of $40,000, and pay the remaining one-half of such price to the defendant. Subsequently, some question arising between the parties, the defendant, on the 15th day of September, 1890, agreed that the lumber thereafter delivered under the contract should be at the price of $27.50 per 1,000. The mills of the defendant are known as the "Penokee Mills," and the lumber manufactured by it is known as "Penokee Lumber." For reasons which appear in the correspondence between the parties, and in the testimony in the case, it would seem that the defendant found itself unable to saw and put into merchantable shape, at its mills, a sufficient amount of lumber to meet the requirements of the contract during the season of 1890; and on the 31st day of October, 1890, in a letter directed to Saxe Bros., the defendant said: "We have to say that we cannot complete contract with you this season." And in a letter dated November 4, 1890, among other things, appears the following: "Kindly advise us as early as possible whether you wish to cancel contract, or have us complete the same as early as possible next season." On November 6, 1890, the defendant wrote a letter to Saxe Bros., a portion of which reads as follows: "We hereby withdraw our statement that we cannot complete contract this season, and ask if you will accept, instead of Penokee stock, other lumber equally good, and very similar to it in the matter of width, texture, dryness," etc. On the 5th of November, 1890, Saxe Bros., in a letter directed to the defendant, say: "As to your question whether we wish to cancel the contract, or have you furnish the lumber in the spring, we can only answer by saying that we have sold the stock, or rather a large portion of it, and wish it sent forward this fall." On the 12th of November, 1890, Saxe Bros. received 276,396 feet of lumber, amounting, at the contract price, to the sum of $7,598.14. Instead of applying one-half of such amount upon the balance of the $40,000 due them, and sending the balance thereof to the defendant, they applied the whole amount thereof, with the exception of $146.39, for which amount they sent a check to the defendant, balancing up the account between the parties. This was the last shipment of lumber by the defendant to the plaintiff's firm. The defendant delivered to the plaintiff's firm 2,791,100 feet of lumber, being a shortage on the contract of 1,208,900 feet.

In August, 1891, the plaintiff's firm commenced this action against the defendant, alleging a breach of contract and damages. Upon the trial, the defendant asserted that the first breach of the contract was upon the part of Saxe Bros. in refusing to pay over to it one-half of the contract price of the lumber received on the 12th of November, 1890. The plaintiff asserted that the letters, extracts from which are above set forth, in which the defendant announced its inability to complete the contract, constituted a breach on its part, and that the withdrawal of that statement in the letter of November 6th was only a conditional one, the condition being the acceptance of other lumber instead of Penokee stock. The referee found against the defendant upon the questions thus raised, and found the measure of damages to be "the difference between the purchase price of the lumber, to wit, $27.50 per thousand feet, and its market value at the time and place of delivery, to wit, $32.50 per thousand feet." The referee based his finding that the market value of the lumber at the place of delivery was $32.50 per 1,000 feet upon a letter of the defendant dated September 5, 1890, in which the defendant argumentatively asserted the value of the lumber to be $32.50 per 1,000 feet. The president of defendant, who wrote the letter, upon examination as a witness, swore that he meant by that that he believed "they would have a gross profit of about $5 per thousand feet by selling it out in small lots." Other facts and evidence will be adverted to hereafter in the discussion of the case.

Argued before PARKER, P. J., and LANDON, HERRICK, and PUTNAM, JJ.

Henry H. Seymour, for appellant.
Harris & Rudd (William P. Rudd, of counsel), for respondent.

HERRICK, J.   Assuming, but not affirming, that the referee was correct in holding that there was a breach of contract upon the part of the defendant in his notifications to the plaintiff's firm that it would not be able to supply the lumber contracted for during the season of 1890, and that its subsequent withdrawal of that notice was not sufficient, and assuming, also, that the letter of the defendant in regard to the value of the lumber at Tonawanda was sufficient evidence upon which to base a finding that its market value there was $33.50, there are still other questions in the case, sufficient, it seems to me, to call for a reversal of the judgment.

Upon a breach of contract for the sale and delivery of merchandise, the ordinary measure of damages is the difference between the contract and the market price at the time and place of delivery.   Parsons v. Sutton, 66 N. Y. 92.   But there is another rule of damages, which is that the party who suffers a breach of contract must so act as to make his damages as small as he reasonably can.   Parsons v. Sutton, 66 N. Y. 92; Roberts v. White, 73 N. Y. 375; Wright v. Bank, 110 N. Y. 237, 18 N. E. 79.

The case of Parsons v. Sutton was one where there was a breach of contract for the sale and delivery of paper to be used as a frontispiece for a magazine, which was to be delivered on the 2d day of June, to be used in printing the July number of the magazine.   The paper was not delivered at the time called for by the contract, and the court, in discussing it, said:

"There is no proof that such paper as this contract called for is not usually to be found in the market, or that it could not, in the small quantity required, be delivered in a few days by manufacturers.   All defendants did was to go to dealers in paper a day or two after the 2d day of June, and try to buy paper like that which plaintiffs were to deliver; and they could find none. It does not appear that they made any further efforts.   It does not appear that they could not find paper which would answer substantially the purpose. No reason is given why they did not try more than once to find the paper."

While the case of Parsons v. Sutton was one where special damages were alleged, the rule announced was not based upon that fact.   The principle "that the party who suffers from a breach of contract must so act as to make his damages as small as he reasonably can" applies just as much to cases where general as to cases where special damages are alleged; the principle is the same in both cases.   The party injured is only entitled to recover such damages in any case as he necessarily sustains, and he does not necessarily sustain a damage that he could obviate by reasonable effort.

In this case there is no evidence that the plaintiff's firm made any efforts or inquiries to procure other lumber in place of that called for by the contract, or to ascertain if such lumber could be procured.   I assume that they could not procure lumber of the kind in question, cut and sawed, at the defendant's mill,—lumber known as "Penokee Lumber"; that, from the correspondence between the parties, the plaintiff's firm was warranted in believing that they had received all that there was to be had of that kind of lumber; and, therefore, that it would be useless for them to at-

tempt to obtain it. But that seems to me is not sufficient. There was no warranty or agreement upon the part of the defendant of the quality of lumber to be furnished, except that it should be as good in quality as that purchased the season before, from A. M. Dodge & Co. The plaintiff's firm were not purchasing it for any special purpose, but for general sale in the market; and there is no pretense but that lumber cut from the same quality of pine, into the same dimensions mentioned in the contract, would have been just as salable in the market, and have answered the purposes of the plaintiff's firm equally well, as though it had been cut at the defendant's mill. This is not a case where the lumber is purchased for a special purpose; as when a person is engaged in the construction of a house, and for the interior woodwork desires some particular kind of wood, which commends itself to his taste, where another kind of wood, although equally durable, and equally fitted for the purpose, will not answer, the purchaser has a right to require the exact article he contracted for. In the contract in this case the essential things as to the lumber are not the mill where it is to be cut, but that it shall be of the specified cut and dimensions, and in quality as good as that purchased the season before, of A. M. Dodge & Co. In their complaint, the plaintiff does not allege or claim any special damages because of the failure to receive lumber manufactured at the defendant's mills. It is an ordinary complaint for damages for breach of contract for the sale and delivery of merchandise of a particular description, and must be governed by the ordinary rules governing such actions; and where the plaintiff's firm could minimize the damages sustained by them by procuring lumber elsewhere, of a like character, and which would answer the same purpose as that contracted for, it would be its duty to do so.

The case is absolutely barren of evidence of any effort or attempt whatever on the part of plaintiff's firm to reduce its loss by the alleged breach of contract, or to procure lumber that would substantially comply with the contract. If it was the duty of the plaintiff"s firm, in endeavoring to minimize its loss by reason of the defendant's failure to fulfill the terms of the contract, to endeavor to procure lumber that would substantially comply with the terms of the contract, as was strongly intimated, if not directly held, by the cases I have cited, then it was competent and material for the defendant to show that such lumber could have been obtained at or about the contract price. The evidence in the case shows that there was in Tonawanda, at the time of the alleged breach of contract on the part of the defendant, lumber of the same grades and sizes as that specified in the contract in question, but better in quality, and more than sufficient in quality, to make up the 4,000,000 feet called for in the contract of the parties, and which would bring as much or more in the market as the product of defendant's mills. The referee has found that navigation on the Erie Canal closed November 30, 1890; so that it would seem that there was ample time to procure this lumber at Tona-

wanda, and receive it at Albany, after either the defendant's notification that it could not furnish the balance, or after the last shipment was received, November 12, 1890. The fact that it was of the grades and sizes, quality and amount, I have stated, is absolutely undisputed in the case. Such lumber belonged to the firm of A. M. Dodge & Co., and was at their docks in Tonawanda. The firm of A. M. Dodge & Co. and defendant occupied the same business office at Tonawanda, and the business there of both concerns was conducted by the same office force.

The president and general manager of the defendant, being the same person who made the contract and carried on the correspondence in behalf of the defendant with plaintiff's firm, was also one of the members of the firm of A. M. Dodge & Co., and had general charge of their business at Tonawanda. Upon the trial, he was asked if he would have sold that pine lumber to the plaintiff in this action at the price mentioned in the contract, and he was also asked if he sold such lumber in the open market at Tonawanda in the month of November, 1890. Both of these questions were objected to, as immaterial and improper. The objections were sustained, and the evidence excluded. I think those rulings were erroneous. It was competent for the defendant to show that the plaintiff's firm could have obtained that lumber, which, as we have previously seen, was of the same kind and character as that called for in the contract, except that it was better in quality for the same price as that mentioned in the contract, which would reduce the damages to which they were entitled for breach of contract to a nominal sum.

The judgment should therefore be reversed, the referee discharged, and a new trial granted; costs to abide the event.

PUTNAM and LANDON, JJ., concur in result. PARKER, P. J., dissents.